**Case No. 24-3292**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

---

**KIRSTYN PAIGE BASHAW,**
Plaintiff-Appellant
vs.
**MAJESTIC CARE OF WHITEHALL, LLC**,
Defendant-Appellee.

---

BRIEF OF APPELLANT

---

**On Appeal from the United States District Court
For the Southern District of Ohio
Case No.: 2:23-CV-00291**

Respectfully submitted,

*/s/ Carrie J. Dyer*
Carrie J. Dyer (0090539)
(*Carrie@Manselllawllc.com*)
Greg R. Mansell (0085197)
(*Greg@Manselllawllc.com*)
Rhiannon M. Herbert (0098737)
(*Rhiannon@Manselllawllc.com*)
**Mansell Law LLC**
1457 S. High St.
Columbus, Ohio 43207
Telephone: (614) 796-4325

*Attorneys for Plaintiff-Appellant*

## <u>TABLE OF CONTENTS</u>

I.      <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u> ...........................1

II.     <u>JURISDICTIONAL STATEMENT</u> ........................................... 1-2

III.    <u>STATEMENT OF THE ISSUES</u> ....................................................2

IV.     <u>STATEMENT OF THE CASE</u> ............................................... 2-13

        A. Factual Background ................................................. 2-12

        B. Relevant Procedural Background ................................. 12-13

V.      <u>SUMMARY OF THE ARGUMENT</u> ..................................... 14-16

VI.     <u>ARGUMENT</u>................................................................ 16-40

        A. Standard of Review.....................................................16

        B. Law and Analysis ..................................................... 16-40

            1. Bashaw's Prima Facie Case...................................... 17-24

                a. Retaliation under R.C. § 3721.24 ............................... 17-21

                    i. Protected Activity ................................................. 18-19

                    ii. Adverse Employment Action ......................................19

                    iii. Casual Link Between Protected Activity &
                    Adverse Action ........................................................ 19-21

                b. Retaliation under Title VII & R. C. 4112.................. 21-24

                    i. Protected Activity .......................................................22

*ii. Majestic Care's Knowledge of the Protected Activity*..............................................*22*

*iii. Adverse Action*.........................................*22*

*iv. Casual Connection*...............................*23-24*

**2. Pretext Analysis** ......................................**25-40**

**a. Reason 1: Bashaw did not want to return to work**....**27-30**

**b. Reason 2: Bashaw recorded work conversations and meetings**........................................**30-33**

**c. Reason 3: Violation of Safe Resident Discharge Policy related to Resident B** ..............................**33-35**

**d. Reason 4: Attendance** ..................................**36-40**

**VII. CONCLUSION**...........................................**40**

**VIII. CERTIFICATE OF COMPLIANCE**.........................**41**

**IX. CERTIFICATE OF SERVICE** ...............................**41**

**X. DESIGNATION OF RELEVANT DIST. COURT DOCUMENTS** ......**42-44**

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Highlands Hosp. Corp.*, 545 F.3d 387 (6th Cir. 2008) ................................. 31

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ............................................ 16

*Arnold v. City of Columbus*, 515 Fed. Appx. 524, 529 (6th Cir. 2013) ................... 21

*Bishop v. Ohio Dep't of Rehab. & Corr.*, 529 Fed. Appx. 685, 696 (6th Cir. 2013) .................................................................................................................. 34

*Braithwaite v. Timken Co.,* 258 F.3d 488, 494 (6th Cir. 2001) ............................... 29

*Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114, 1127 (10th Cir. 2005) .............. 26

*Burley v. Gagacki*, 729 F.3d 610, 618 (6th Cir. 2013) ............................................ 16

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1990) .................................. 22

*Dolan v. St. Mary's Home*, 2003-Ohio-3383, 794 N.E.2d 716, 721 (Ohio Ct. App. 2003) ...................................................................................................................... 17

*Drerup v. Netjets Aviation Inc.*, 6th Cir. No. 22-3475, 2023 U.S. App. LEXIS 16469, at *22 (June 27, 2023) ......................................................................... 39

*Fuentes v. Perskie*, 32 F.3d 759, 764-65 n.7 (3d Cir. 1994) .................................. 26

*Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009) ..................................... 16

*Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir.2012) ........................................ 27

*Grimsley v. Am. Showa, Inc.*, 2017 U.S. Dist. LEXIS 133350, *15 (S.D. Ohio Aug. 21, 2017)................................................................................................20

*Husmeyer v. Hospice of Southwest Ohio, Inc.* 29 N.E.3d 903, 2014-Ohio-5511, ¶ 30 ................................................................................................18

*Jones v. St. Jude Med. S.C., Inc.,* 504 F. App'x 473, 476 (6th Cir. 2012) .............17

*Marcum v. Bd. of Educ. of Bloom-Carroll Local Sch. Dist.*, 727 F. Supp.2d 657, 671 (S.D. Ohio 2010) ................................................................................................20

*Marshall v. Rawlings Co. LLC*, 854 F.3d 368, 377 (6th Cir. 2017) .......................34

*Meyers v. Goodrich Corp.*, 8th Dist. Cuyahoga No. 95996, 2011-Ohio-3261, ¶28 ................................................................................................19

*Nathan v. Ohio State Univ.*, 984 F. Supp. 2d 789, 801 (S.D. Ohio 2013) .............25

*O'Donnell v. Genzyme Corp.*, 2015 U.S. Dist. LEXIS 30036, *29 (N.D. Ohio Mar. 11, 2015)................................................................................................ 19-20

*O'Malley-Donegan v. Metrohealth Sys.*, 8th Dist. Cuyahoga No. 104544, 2017-Ohio-1362, ¶ 23................................................................................................19

*Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio C.R. Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981)................................................................................................17

*Quintanilla v. AK Tube LLC*, 477 F.Supp.2d 828 (N.D. Ohio 2007)......................31

*Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724 (6th Cir. 2006) .................20

*Smith v. Chrysler*, 155 F.3d 799, 807 (6th Cir. 1998) .............................................29

*Smith v. Chrysler Corp*., 155 F.3d 799, 809 (6th Cir.1998) ....................................26

*Smith v. City of Salem*, 378 F.3d 566, 570 (6th Cir. 2004)............................... 21, 23

*Smith v. Good Samaritan Hosp*., No. 1:06-cv-207, 2007 U.S. Dist. LEXIS 48304, 2007 WL 1974952, (S.D. Ohio July 3, 2007).......................................................26

*Staub v. Proctor Hosp*., 562 U.S. 411, 415 (2011).....................................................34

*Stein v. National City Bank*, 942 F.2d 1062, 1065 (6th Cir. 1991) .........................30

*Thatcher v. Goodwill Indus*., 117 Ohio App.3d 525, 535, 690 N.E.2d 1320 (9th Dist.1997)................................................................................................................20

### Statutes

28 U.S.C. § 1331 ..........................................................................................................1

28 U.S.C. § 1367 ..........................................................................................................1

28 U.S.C. § 1291. .........................................................................................................2

R.C. 3721.24 ...............................................................................1-2, 16-17, 19, 26

R.C. 4112, *et seq*. .................................................................................. 2, 17, 21, 26

## I.    <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

Appellant Bashaw requests an oral argument. This case involves detailed and complex factual and legal issues, and oral argument will help assist the Court in making its determination.

## II.    <u>JURISDICTIONAL STATEMENT</u>

Plaintiff-Appellant Kirstyn Paige Bashaw ("Bashaw") initiated this action against Defendant-Appellee Majestic Care of Whitehall, LLC ("Majestic Care") on May 27, 2022 in the Court of Common Pleas in Frankin County, Ohio. (Complaint, RE 2, PageID #80-89) Bashaw asserted claims under Ohio law for Retaliatory Termination pursuant to R.C. 3721.24 and Wrongful Termination in Violation of Ohio Public Policy—Counts I & II, respectively. (Id.) On January 17, 2023, Bashaw filed an Amended Complaint, adding claims of Retaliation brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, and the Ohio Revised Code, Chapter 4112, *et seq.*—Counts III & IV, respectively. (Amended Complaint, RE 7, PageID #129-140)

On January 20, 2023, Majestic Care removed this action to the United States District Court for the Southern District of Ohio. (Notice of Removal, RE 1, PageID #1-5) The District Court had original jurisdiction pursuant to 28 U.S.C. § 1331 because Bashaw's Amended Complaint included claims brought pursuant to the laws of the United States. The District Court exercised supplemental jurisdiction over Bashaw's state law claims pursuant to 28 U.S.C. § 1367. (Id.) Count II of the

Amended Complaint was eventually dismissed pursuant to the District Court's June 8, 2023 Opinion & Order. (RE 17, PageID #198-204)

On March 25, 2024, the District Court granted Majestic Care's Motion for Summary Judgment on all of Bashaw's claims asserted in the action. (Opinion & Order, RE 35, PageID #1051-1072) Bashaw timely filed her Notice of Appeal on April 8, 2024. (Notice of Appeal, RE 37, PageID #1074). This appeal is taken from a final order disposing of all parties' claims. This Court has jurisdiction of this appeal pursuant 28 U.S.C. §1291.

## III.  <u>STATEMENT OF THE ISSUES</u>

1. Whether the District Court improperly granted Majestic Care's Motion for Summary Judgment on Bashaw's claims of: 1) Retaliation under R.C. 3721.24 (Count I); 2) Retaliation under Title VII of the Civil Rights Act of 1964 (Count III); and 3) Retaliation under R.C. 4112 (Count IV);

2. Whether the District Court erred in holding that Bashaw could not raise a genuine issue of material fact as to pretext on her retaliation claims.

## IV.  <u>STATEMENT OF THE CASE</u>

### A.    **Factual Background**

Bashaw began her employment with Majestic Care on November 9, 2021. (Deposition of Kirstyn Paige Bashaw, Volume I [hereinafter "Bashaw Dep."], RE 25-1 & 25-2, *filed under seal*, PageID #629) Bashaw was employed in the role of Director of Social Services. (Bashaw Dep. PageID #629) In this role, Bashaw was

one of a number of employees who comprised an "interdisciplinary team" or "care team." (Bashaw Declaration, RE 30-1, ¶4) The interdisciplinary team was led by Bashaw's supervisor, Majestic Care's Executive Director, Edward Beatrice. (Bashaw Dep. PageID #632)

As Director of Social Services, Bashaw was responsible for performing assessments for new residents upon admission to Majestic Care's facility. (Bashaw Dep. PageID #629) She also participated in care team meetings, and she was tasked with responding to and assisting with emergency resident needs, including situations requiring de-escalation or change in status for a resident. (Bashaw Dep. PageID #629) In addition to the care team meetings, Bashaw participated—along with other members of the interdisciplinary team, including the Executive Director—in group meetings referred to as "stand-up" (start of the day, also referred to as "morning meeting") and "stand-down" (end of day) meetings. (Bashaw Dep. PageID #630)

Bashaw enjoyed her work, and she took pride in ensuring that Majestic Care's patients received excellent and safe care while residing in the facility. (Bashaw Dep. PageID #638) However, she began to grow concerned about resident care at Majestic Care. Bashaw began to document instances of substandard care in her personal notebook that she carried with her on a daily basis. (Bashaw Dep. PageID #648-651) Although Bashaw did not provide a copy of her notebook to anyone at Majestic Care, she voiced her concerns contained therein regarding the substandard care, possible

3

abuse, and neglect to her supervisor, Edward Beatrice, as well as HR Representative Chandler Kuhn.

Specifically, in or around February 2022, Bashaw began having concerns with the conduct of Leonta Coston, a nurse employed by Majestic Care. (Bashaw Dep. PageID #636) Bashaw observed Ms. Coston cursing at patients on at least two occasions. (Bashaw Dep. PageID #636) When Bashaw attempted to speak with Ms. Coston about this, Ms. Coston began cursing at Bashaw. (Id.)

Most troubling was Ms. Coston's behavior toward a resident in Majestic Care's memory care unit, "Resident A." (Bashaw Dep. PageID #639) In Bashaw's presence, Resident A expressed increased pain in her leg and an inability to move her leg. (Bashaw Dep. PageID #639) Bashaw also personally observed "some type of fluid or blood seeping through the dressing" on Resident A's leg. (Bashaw Dep. PageID #639) Bashaw reported Resident A's complaints and Bashaw's concerns regarding the condition of her leg to Resident A's nurse, Ms. Coston.[1] (Bashaw Dep. PageID #639) Ms. Coston informed Bashaw that Resident A was "fine" and "doesn't need anything." (Bashaw Dep. PageID #639) At Bashaw's insistence, Ms. Coston agreed to call Majestic Care's wound nurse; however, Ms. Coston failed to do so. (Bashaw Dep. PageID #641) Ms. Coston "refused to even look at the wound. She

---

[1] As Director of Social Services, Bashaw did not—and was not permitted to—provide any direct medical care to Majestic Care's residents. (Bashaw Dep. PageID #641)

4

refused to call the doctor to request additional or a change in pain medication, and/or help [Resident A] get out of bed." (Bashaw Dep. PageID #641)

Bashaw reported her belief that Ms. Coston was neglecting Resident A to Edward Beatrice and Amia Ford (Director of Nursing). (Bashaw Dep. PageID #639, 641) During his deposition, Mr. Beatrice confirmed that Bashaw "brought up concerns related to [Resident A's] care."  (Deposition of Edward Beatrice (hereinafter "Beatrice Dep."), RE 25-4 & RE 28-1, *filed under seal*, PageID #556) No action was taken to address Bashaw's concerns; she was instructed not to worry about nursing. (Bashaw Dep. PageID #641; Beatrice Dep. PageID #556) Shortly thereafter, Resident A was hospitalized and had to undergo an above-the-knee amputation due to a severe infection. (Bashaw Dep. PageID #641; Beatrice Dep. PageID #556)

Toward the final months of her employment, Bashaw's complaints regarding patient abuse and/or neglect began to increase in frequency. (Bashaw Dep. PageID #637) Bashaw raised concerns to Mr. Beatrice on numerous occasions in mid- to late-February 2022, including but not limited to the following: lack of attention and care from nurses leading patients to get frequent urinary tract infections; nurses' failure to provide bathing assistance required by patients' treatment plans, leading to bowl infections; lack of staff training to properly handle severe behavioral issues of patients; and a general lack of adequate care by Majestic Care's staff.  (Bashaw Dep. PageID #638)

5

In addition to Bashaw's complaints regarding Resident A, Mr. Beatrice recalled Bashaw's complaints to him regarding lack of sufficient staff members on the memory care unit (Beatrice Dep. PageID #557) and lack of proper staff training to care for Majestic Care's residents (Beatrice Dep. PageID #557). Because Bashaw did not find the recourse she needed after raising these concerns to her supervisor, Bashaw formally elevated her complaints to Majestic Care HR.

On March 1, 2022, Bashaw met with Majestic Care's HR Representative on site at the facility, Chandler Kuhn. (Bashaw Dep. PageID #633; see also Deposition of Kirstyn Paige Bashaw, Volume II (hereinafter "Bashaw Dep. II"), RE 27-4, PageID #705) During the meeting, Bashaw reported her concerns about resident care, including the neglect of Resident A. (Bashaw Dep. PageID #633, 636; Bashaw Dep. II PageID #705-706). Bashaw also reported that the facility's nurses were "not answering call lights, not answer the phone, not assisting a patient when they needed assistance…" (Bashaw Dep. PageID #633) Bashaw complained that she had raised concerns of poor patient care, and that Mr. Beatrice was willing to "let those things go or slide." (Bashaw Dep. PageID #634) Additionally, Bashaw reported what she believed to be sexually-harassing conduct of Edward Beatrice toward female staff members. (Bashaw Dep. PageID #634) Bashaw provided an example of times that Mr. Beatrice entered Jaila Hopson's office while her door was closed.[2] (Bashaw Dep.

---

[2] At all times relevant herein, Jailah Hopson was employed with Majestic Care in the role of Admissions Director. (Declaration of Jailah Hopson, RE 30-3, ¶3,

PageID #634) Bashaw explained that it was well known that when Ms. Hopson's door was closed it was because she was expressing breast milk. (Bashaw Dep. PageID #634) Despite that, Mr. Beatrice entered Ms. Hopson's office with her door shut and blinds drawn, and continued to carry on a conversation with her while she was expressing breast milk. (Hopson Dec., RE 30-3, ¶ 16; see also Bashaw Dep. II PageID #703) This caused Ms. Hopson to feel offended and violated. (Hopson Dec., RE 30-3, ¶17)

Bashaw also reported to Mr. Kuhn what she believed to be Mr. Beatrice's "culturally insensitive and often offensive language primarily pertaining to people of color, women." (Bashaw Dep. PageID #634) For example, Bashaw reported that she believed it was inappropriate for Mr. Beatrice to refer to certain members Majestic Care's staff as "ratchet," "ghetto," and "bougie." (Bashaw Dep. PageID #634; Bashaw Dep. II PageID #695)

Thereafter, Mr. Kuhn informed Mr. Beatrice of Bashaw's reports. (Beatrice Dep. PageID #559, 569) Mr. Kuhn also provided a written recap of Bashaw's reports to Regional HR Director, Simone Wimberly. (Chandler Kuhn File Note, RE 21-7, PageID #257; see also Deposition of Melany Nieset, RE 25-5, PageID #587-618, *filed under seal*, at 26 (hereinafter "Nieset Dep."))

---

PageID #885) Ms. Hopson was a member of the interdisciplinary team and reported to Mr. Beatrice. (Id. ¶4)

On or around March 2, 2022, the day after Bashaw's complaint to Mr. Kuhn, Bashaw learned that one of Majestic Care's residents, "Resident B," had been readmitted to Majestic Care. (Bashaw Dep. PageID #642-643) In the month prior, Resident B was experiencing increased levels of psychosis that ultimately resulted in Resident B's admission to Mt. Carmel East for emergency psychiatric intervention. (Bashaw Dep. PageID #642; Bashaw Dec., RE 30-1, at ₱7) While Resident B was hospitalized, Bashaw received a call from a social worker at Mt. Carmel, who she believed was named Jennifer. (Bashaw Dep. PageID #643) Bashaw learned that Resident B was still experiencing severe psychological issues, which Majestic Care is not equipped to respond to, as it is not a psychiatric facility. (Bashaw Dep. PageID #643-644) Bashaw explained this to the Mt. Carmel social worker during her phone call. (Bashaw Dep. PageID #644) However, at no time did Bashaw inform the Mt. Carmel social worker—or any other individual at Mt. Carmel—that Majestic Care would not readmit Resident B. (Bashaw Dep. PageID #644) Bashaw would not have had the authority to make that decision, even if she felt strongly that Resident B's readmission to Majestic Care was improper. (Bashaw Dep. PageID #644) Instead, Bashaw knew that she needed to address the issue directly with Mr. Beatrice. (Bashaw Dep. PageID #644)

Resident B's readmission was discussed during morning meeting on March 2, 2022. (Bashaw Dep. PageID #642-643) Mr. Beatrice informed Bashaw that Resident B was readmitted and placed in the locked memory care unit. (See Recording #2 and

Transcript of Recording, p.2, RE 21-12, *filed manually*) Bashaw complained that Resident B should not be kept on a locked unit without a proper diagnosis; otherwise, Majestic Care would be holding him against his will when he is his own healthcare power of attorney. (Recording #2 Transcript, p. 2-3) Mr. Beatrice advised that he was following the facility medical director's recommendation. (Id.) Bashaw continued to push back, asking Mr. Beatrice if he "feels like this is legal," (Recording #2 Transcript, p. 3), to which Mr. Beatrice responded: "I don't know if legal is the word I would use.") (Id.) Mr. Beatrice admitted that he didn't like this solution either, but because Mt. Carmel threatened to report the facility to the Department of Health if they did not accept Resident B, it was the option they were stuck with. (Recording #2 Transcript, p. 3-4) Bashaw emphasized that she did not know what the right call was for Resident B, but that she was very concerned not only for him, but for the other issues she's reported in the building, including residents getting hurt and not getting the medical treatment they needed. (Recording #2 Transcript, p. 5) When it became clear to Bashaw that her concerns were falling on deaf ears, she departed the meeting and left the facility. (Bashaw Dep. PageID #645) Bashaw is bound by her license and code of ethics, and she could not "be part of the mistreatment and/or illegal activity of a patient." (Bashaw Dep. PageID #645) Her decision to stay would have amounted to compliance with what she reasonably believed to be "unethical and illegal" treatment of a resident. (Bashaw Dep. PageID #644-645)

9

Following the March 2, 2022 meeting, Mr. Beatrice contacted Melany Nieset, Vice President of HR (Beatrice Dep. PageID #827) Mr. Beatrice was worried that, due to Bashaw's complaints of Resident B's wellbeing, as well as the concern Bashaw expressed for others on the unit, "concern was going to be created." (Beatrice Dep. PageID #541) Not only was Bashaw "verbalizing concerns for [Resident B]" but she was "verbalizing concerns overall." (Beatrice Dep. PageID #827)

Later that day, Melany Nieset called Bashaw and told her not to return to the building while HR investigated. (Nieset Dep. PageID #801; Bashaw Dec., ER 30-1, ₱8) Ms. Nieset provided no details about the subject matter of the investigation at that time. (Bashaw Dec., RE 30-1, ₱9) Bashaw assumed Majestic Care was finally investigating her complaints about patient neglect and abuse. (Bashaw Dec., RE 30-1, ₱10)

On or around March 4, 2022, Ms. Nieset contacted Bashaw to conduct an interview as part of the HR investigation. (Nieset Dep. PageID #801; *see also* See Recording #3 and Transcript of Recording, RE 21-13, *filed manually*) Ms. Nieset explained she was investigating the concerns Bashaw raised to Mr. Kuhn, as well as the concerns she received about Bashaw from Mr. Beatrice. (Recording #3 Transcript, p.1) During the call, Bashaw explained that Mr. Beatrice accused her of informing Kathy, a social worker at Mt. Carmel, that Majestic Care would not readmit Resident B. (Recording #3 Transcript, p.4-5) Bashaw informed Ms. Nieset

10

that she never spoke with Kathy. Instead, she talked with Jennifer, and at no time did she ever state that Majestic Care would not accept Resident B back at the facility. (Recording #3 Transcript, p.4-5) Bashaw identified at least two other Majestic Care employees in the room with her when she spoke to the Mt. Carmel social worker, and she provided those individuals' names to Ms. Nieset. (Recording #3 Transcript, p.5-6) Ms. Nieset did not specifically request any information from Bashaw as part of HR's "investigation" regarding Bashaw's reports of sexual harassment and racial insensitivity against Mr. Beatrice. (*See generally* Recording #3 Transcript)

Ms. Nieset also called Mr. Beatrice as part of her HR investigation. (Nieset Dep. PageID #798) During the call, Mr. Beatrice informed Ms. Nieset about his concerns regarding Bashaw. Specifically, Mr. Beatrice intentionally incorrectly informed Ms. Nieset that Bashaw had "made the decision not to accept [Resident B] [for readmission] without conveying or communicating with him or the director of nursing." (Nieset Dep. PageID #798-799) Mr. Beatrice also raised concerns for the first time related to Bashaw's attendance. (Nieset Dep. PageID #799) Finally, Mr. Beatrice conveyed that Bashaw was disrespectful and argumentative. (Nieset Dep. PageID #799) In other words, Mr. Beatrice did not appreciate his authority being questioned in the form of Bashaw's incessant complaints regarding resident care and safety issues. At the conclusion of the conversation, Mr. Beatrice recommended Bashaw's termination. (Beatrice Dep. PageID #568)

11

Ms. Nieset did not speak with any other employees as part of her investigation. (Nieset Dep. PageID #802-803) Ms. Nieset did not attempt to contact any of the social workers at Mt. Carmel. (Nieset Dep. PageID #802) Nor did Ms. Nieset attempt to speak with any of Bashaw's witnesses to her conversation with Mt. Carmel's social worker. (Nieset Dep. PageID #802) Using the input and recommendation from Mr. Beatrice, Ms. Nieset terminated Bashaw on March 9, 2022. (Nieset Dep. PageID #804)

Ms. Nieset testified that Bashaw was terminated for four (4) reasons (Nieset Dep. PageID #805: "Q: So there's four reasons? A: Yes."):

1) First, Ms. Bashaw was terminated because she informed Ms. Nieset that she did not want to return to Majestic Care's facility. (Nieset Dep. PageID #805)
2) Second, Ms. Bashaw was terminated because she admitted to recording two (2) conversations. (Nieset Dep. PageID #805)
3) Third, Ms. Bashaw was terminated for the "[Resident B] issue," resulting in Ms. Bashaw's violation of Majestic Care's policies on safe resident discharge. (Nieset Dep. PageID #805-806)
4) Finally, Ms. Bashaw was terminated for attendance. (Nieset Dep. PageID #805)

## B.    Relevant Procedural Background

On August 11, 2023, Majestic Care filed its Motion for Summary Judgment on Bashaw's remaining claims (Counts I, III, & IV). (MSJ, RE 21, PageID #221-242).  Bashaw filed her opposition on September 1, 2023 (Resp. in Opp. To MSJ, RE 30, PageID #837-870), and Majestic Care filed a Reply on September 15, 2023. (Reply in Support, RE 34, PageID #1040-1050) The District Court issued its Opinion

& Order granting Majestic Care's Motion for Summary Judgment on all claims. (MSJ Decision, RE 35, PageID #1051-1072). Thereafter, the Clerk entered judgment in Majestic Care's favor. (Judgment Entry, RE 36, PageID #1073).

In considering Bashaw's claims, the District Court assumed for purposes of the Decision that Bashaw could establish her *prima facie* case for her retaliation claims. (MSJ Decision, RE 35, PageID #1061) However, the District Court held that because Bashaw's claims fail at the pretext stage, judgment should be entered in Majestic Care's favor. (Id.) Specifically, the Court considered the four (4) reasons proffered by Majestic Care for terminating Bashaw. (Id.) The Court held that although one of the reasons presented a question for the jury, the other three reasons provided by Majestic Care were "legitimate and non-retaliatory." (Id., PageID #1072) In reaching this conclusion, the District Court improperly resolved genuine disputes over material facts. For that reason, this Court should find that the District Court erred in holding that Bashaw failed to present evidence from which a jury could conclude that Majestic Care's reasons for terminating Bashaw were a pretext for retaliation.

Bashaw respectfully requests reverse the District Court's granting of summary judgment for Majestic Care on all claims and remand this case for trial on the outstanding factual disputes.

13

## V.    **SUMMARY OF THE ARGUMENT**

Majestic Care retaliated against Bashaw when it terminated her employment after she engaged in protected activity, including complaining about suspected resident abuse and/or neglect and about her supervisor's sexually-harassing and racially insensitive behavior.

Majestic Care created four reasons in support of its decision to terminate Bashaw with the hope that one would stick. In cases such as this one, where an employer proffers multiple reasons for termination, the proper analysis is whether the plaintiff manages to cast substantial doubt on a fair number of them. At the summary judgment stage, a plaintiff need only rebut, not disprove, an employer's explanation.

First, Majestic Care argues that Bashaw was terminated because she informed Melany Nieset that she did not want to return to work. However, the phone call during which Bashaw allegedly made this statement is recorded. A review of the transcript demonstrates Bashaw never indicated a desire not to return to work; instead, she stated that she loved her job and was hopeful things at Majestic Care would improve. This reasoning is not based in fact and Ms. Nieset did not "honestly believe" that Bashaw did not want to return to work.

Second, Majestic Care argues that Bashaw was terminated for recording meetings without staff members' knowledge or consent. However, it is undisputed that Majestic Care did not have a policy prohibiting recording in the facility. Further,

there is no allegation that Bashaw knowingly violated any prohibition against recording; that Bashaw utilized the recordings for any improper purpose; or that Bashaw shared the recordings with anyone aside from her counsel. Bashaw made the recordings solely for the purpose of protecting her license. A jury can conclude that the recorded meetings were not the real motivation for Bashaw's termination.

Third, Majestic Care claims that Bashaw was terminated for violating its policy on safe resident discharge related to Resident B. In making this determination, Ms. Nieset relied solely on inaccurate information provided by the discriminating supervisor, Mr. Beatrice, and failed to perform an independent investigation. Under a cat's paw theory, the District Court properly concluded that Majestic Care's reasoning in support of this reason for termination raised a genuine issue of fact as to pretext.

Finally, Majestic Care argues that Bashaw was terminated due to her attendance. A jury can conclude that Bashaw's alleged attendance infractions did not actually motivate its decision to terminate her. First, Bashaw can demonstrate that Mr. Beatrice intended to reprimand Bashaw for her attendance infractions by issuing her a corrective action. It was not until after he learned of Bashaw's protected complaints that Mr. Beatrice determined Bashaw's attendance infractions warranted termination. Second, Majestic Care's attendance policy was not uniformly enforced, and other department managers were not terminated for similar attendance infractions.

15

Bashaw can cast substantial doubt on each reason advanced by Defendant for her termination. Summary judgment in Majestic Care's favor is improper and this Court should reverse the District Court's holding and remand this case for trial on Bashaw's retaliation claims.

## VI.    ARGUMENT

### A.    STANDARD OF REVIEW

This Court reviews *de novo* the district court's grant of summary judgment. *Geiger v. Tower Auto*., 579 F.3d 614, 620 (6th Cir. 2009).  Pursuant to Fed. R. Civ. P. 56(a), summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, the court determines there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Burley v. Gagacki*, 729 F.3d 610, 618 (6th Cir. 2013).

The moving party has the burden of showing the absence of genuine disputes over facts, which, under the substantive law governing the issue, might affect the outcome of the action. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Id*. at 255.

### B.    LAW & ANALYSIS

Bashaw asserts three retaliation claims against Majestic Care: 1) Retaliation under R.C. 3721.24 (Count I); 2) Retaliation under Title VII of the Civil Rights Act

of 1964 (Count III); and 3) Retaliation under R.C. 4112 (Count IV). As the District Court noted, all three claims can be generally analyzed together, as the standards are substantially similar. (MSJ Decision, RE 35, PageID #1060) (citing *Jones v. St. Jude Med. S.C., Inc.,* 504 F. App'x 473, 476 (6th Cir. 2012); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio C.R. Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981); and *Dolan v. St. Mary's Home*, 2003-Ohio-3383, 794 N.E.2d 716, 721 (Ohio Ct. App. 2003)).

### 1. Bashaw's Prima Facie Case

While the parties disputed whether Bashaw could establish a prima facie case of retaliation in their summary judgment briefing, the District Court assumed that she could. (MSJ Decision, RE 35, PageID #1061) In reviewing *de novo,* this Court can likewise conclude that Bashaw can establish her prima facie case on all claims.

### a.  Retaliation under R.C. § 3721.24

It is unlawful for an employer to retaliate against an employee who, "in good faith, makes or causes to be made a report of suspected abuse, neglect, or exploitation of a resident [of a nursing home or residential care facility] [or] . . . indicates an intention to make such a report . . ." R.C. § 3721.24(A). To establish a prima facie case for retaliatory discharge under § 3721.24, Bashaw must demonstrate: (1) that she engaged in a protected activity; (2) that she was the subject of an adverse employment action; and (3) that a causal link existed between the protected activity and the adverse action. *Dolan*, 2003-Ohio-3383, ¶ 19.

17

*i. Protected Activity*

First, a plaintiff can satisfy this element if she demonstrates that she reported suspected patient abuse and/or neglect to her employer. *Husmeyer v. Hospice of Southwest Ohio, Inc.* 29 N.E.3d 903, 2014-Ohio-5511, ¶ 30.  Bashaw engaged in protected activity when she reported her belief that one of Majestic Care's nurses, Leona Coston, was providing substandard care and neglecting Resident A. (Bashaw Dep. PageID #639, 641) Mr. Beatrice admitted that Bashaw raised concerns to him related to Resident A's care. (Beatrice Dep. PageID #556) Jailah Hopson's testimony also corroborates Bashaw's testimony that she reported the possible abuse and/or neglect of Resident A to Mr. Beatrice during stand up meetings. (Hopson Dec., RE 30-3, ¶25-27) Bashaw also engaged in a protected activity when she complained to Mr. Beatrice that Majestic Care's actions with respect to Resident B—i.e., the decision to hold him against his will in a locked unit without a proper diagnosis—amounted to what she believed was abuse. (Recording #2 Transcript, p. 2-3)

In addition to her complaints about Residents A and B, Bashaw complained to Mr. Beatrice that Majestic Care's residents were not being adequately cared for, citing resident urinary tract infections and other infections due to lack of timely care. (Bashaw Dep. PageID #638) Bashaw also complained about the lack of training for Majestic Care's staff, which jeopardized not only residents' safety but the safety to other staff, (Bashaw Dep. PageID #638: "They're not being cared for. They're being

abused. They're abusive towards staff and other patients."), which Mr. Beatrice recalled during his deposition. (Beatrice Dep. PageID #557) Bashaw undoubtedly engaged in a protected activity.

### ii.  Adverse Employment Action

For purposes of a R.C. § 3721.24 retaliation claim, adverse actions include "discharging…the employee. . . and any other action intended to retaliate against the employee." R.C. § 3721.24(A). Bashaw's termination qualifies as an adverse job action.

### iii.  Causal Link Between Protected Activity & Adverse Action.

In the context of a retaliatory discharge claim under R.C. 3721.24, Ohio courts have held that it is appropriate to look to the temporal proximity between the employee's protected activity and the termination when evaluating whether the requisite causal link exists. *O'Malley-Donegan v. Metrohealth Sys*., 8th Dist. Cuyahoga No. 104544, 2017-Ohio-1362, ¶ 23. "Very close" temporal proximity, standing alone, can create such an inference. E.g., *Meyers v. Goodrich Corp.*, 8th Dist. Cuyahoga No. 95996, 2011-Ohio-3261, ¶28 ("Close temporal proximity between the employer's knowledge of the protected activity and the adverse employment action alone may be significant enough to constitute evidence of a causal connection — but only if the adverse employment action occurs "very close" in time after an employee learns of a protected activity."); *O'Donnell v. Genzyme*

*Corp.*, 2015 U.S. Dist. LEXIS 30036, *29 (N.D. Ohio Mar. 11, 2015) (holding one week temporal proximity sufficient to establish causal connection element); *Marcum v. Bd. of Educ. of Bloom-Carroll Local Sch. Dist.*, 727 F. Supp.2d 657, 671 (S.D. Ohio 2010) (holding same); *Grimsley v. Am. Showa, Inc*., 2017 U.S. Dist. LEXIS 133350, *15 (S.D. Ohio Aug. 21, 2017) (holding same); *Thatcher v. Goodwill Indus*., 117 Ohio App.3d 525, 535, 690 N.E.2d 1320 (9th Dist.1997) (holding three weeks between protected activity and adverse action sufficient to establish a causal link).

Bashaw's protected complaints regarding Resident A's and Resident B's care occurred in February 2022 (Bashaw Dep. PageID #636, 639), and on March 2, 2022 (Bashaw Dep. PageID #626), respectively. The very same day Bashaw engaged in a protected activity, Ms. Nieset informed her not to return to the facility while HR performed an investigation. (Nieset Dep. PageID #801) One week later, on March 9, 2022, Bashaw was terminated. (Nieset Dep. PageID #804) This "very close" temporal proximity is sufficient to establish the causal connection element. However, Bashaw need not rely on temporal proximity alone.

In *Randolph v. Ohio Dep't of Youth Servs*., 453 F.3d 724 (6th Cir. 2006), the plaintiff made protected complaints in June and July 1996. *Id*. at 737. She was placed on administrative leave on June 17, 1996, and ultimately terminated on December 13, 1996. *Id*. The court considered the temporal proximity between the plaintiff's complaints and her placement on administrative leave, as well as the *reason* for the

plaintiff's administrative leave. *Id.* The court noted that the focus of the defendant's investigation was on the *plaintiff's* alleged misconduct, and not on the subject of *plaintiff's protected complaints* made just prior to her leave. *Id.* Considering these circumstances, the court held that there was sufficient evidence to support a causal connection between the plaintiff's protected activity and the adverse action. *Id.*

That is precisely what occurred here. Bashaw's latest protected complaint occurred on March 2, 2022, the same day on which Bashaw was placed on leave so Majestic Care could conduct an investigation. (Bashaw Dec., RE 30-1 ⁋8) However, instead of investigating Bashaw's protected complaints of resident abuse and neglect, Majestic Care investigated Bashaw's alleged performance and conduct issues raised for the first time by Mr. Beatrice just after Bashaw's March 2nd protected complaint. (See Recording #3 Tr.; see also Bashaw Dec. ⁋11) Considering these circumstances, in conjunction with the close temporal proximity, a jury could certainly determine Bashaw has established the requisite causal link.

b. Retaliation under Title VII & R.C. 4112

In order to establish a prima facie case of retaliation under Title VII and Ohio law, Bashaw must show that: (1) she engaged in activity protected under Title VII; (2) Majestic Care knew that she engaged in the protected activity; (3) Bashaw was subject to an adverse action; and (4) the protected activity and the adverse action were causally connected. *Smith v. City of Salem*, 378 F.3d 566, 570 (6th Cir. 2004); See *Arnold v. City of Columbus*, 515 Fed. Appx. 524, 529 (6th Cir. 2013) (holding

the same analysis applies for a plaintiff's Title VII and Ohio law discrimination claims)

### i.    *Protected Activity*

First, Bashaw engaged in a protected activity when she complained to Chandler Kuhn about what she believed to be Mr. Beatrice's sexually-harassing conduct and racially insensitive behavior.  (Bashaw Dep. PageID #634) Majestic Care does not dispute that Bashaw raised such complaints. (Defendant's MSJ, RE 21, PageID #237) ("Majestic Care does not dispute that Ms. Bashaw raised such concerns.")

### ii.    *Majestic Care's Knowledge of the Protected Activity*

Second, Majestic Care was aware of Bashaw's protected complaints. Specifically, Mr. Beatrice admitted that Mr. Kuhn informed him of Bashaw's complaints. (Beatrice Dep. PageID #559, 569) Mr. Kuhn also provided a written recap of Bashaw's complaints to Simone Wimberly (Regional HR Director). (See Chandler Kuhn File Note, RE 21-7, PageID #257; see also Nieset Dep. PageID #794) Bashaw's complaints were shared with Ms. Nieset as well. (Nieset Dep. PageID #794)

### iii.    *Adverse Action*

Third, Bashaw was subject to an adverse job action when her employment was terminated on March 9, 2022. See *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1990) (identifying termination as adverse employment action).

### iv. *Causal Connection*

Finally, the evidence demonstrates that there was a causal connection between Bashaw's complaints of sexual harassment and racial insensitivity by Mr. Beatrice and her termination. Again, the extremely close temporal proximity between Bashaw's formal complaint to Mr. Kuhn on March 1, 2022 (Bashaw Dep. PageID #633; Bashaw Dep. II PageID #704-705) and her removal from the facility the next day (Nieset Dep. PageID #801 Bashaw Dec., RE 30-1, ¶8), followed thereafter by her termination on March 9, 2022 (Nieset Dep. PageID #804), demonstrates the requisite causal connection. *See Smith v. City of Salem*, 378 F.3d 566, 570-71 (6th Cir. 2004).

In *Smith*, the plaintiff engaged in a protected activity when he filed a charge of discrimination with the Equal Employment Opportunity Commission and hired legal counsel to address the actions that he believed were unlawfully taken against him by his employer. *Id.* at 569. The plaintiff's attorney contacted the defendant on April 20, 2001, and the plaintiff received his notice of right-to-sue from the EEOC on April 22, 2001. *Id.* at 571. Four days later, the plaintiff was suspended. *Id.* The Sixth Circuit held that this "temporal proximity between the events is significant enough to constitute ***direct evidence of a causal connection*** for the purpose of satisfying [the plaintiff's] burden of demonstrating a prima facie case." *Id.* (emphasis added). *See also O'Donnell* at \*29 (one week temporal proximity sufficient to

23

establish causal connection element); *Marcum*, 727 F. Supp.2d at 671 (S.D. Ohio 2010) (same); *Grimsley*, 2017 U.S. Dist. LEXIS 133350, at *15 (same).

Bashaw's protected complaint against Mr. Beatrice was made on March 1, 2022. (Bashaw Dep. PageID #633; Bashaw Dep. II PageID #705) Ms. Nieset asked Bashaw not to return to the facility the following day while HR investigated. (Nieset Dep. PageID #801; Bashaw Dec., RE 30-1, ₧8) As part of that investigation, Ms. Nieset called Bashaw. (See Recording #3) However, instead of focusing her information gathering on Bashaw's allegations of sexual harassment and racial insensitivity, Ms. Nieset investigated Bashaw for alleged performance and conduct issues raised for the first time by Mr. Beatrice. (See Recording #3.; *see also* Bashaw Dec., RE 30-1, ₧11)

Further supporting this causal connection, Mr. Beatrice's disdain for employees engaging in protected activities was well known throughout the facility. For example, Business Office Manager, Keyon Beckley (a current employee at the time of his deposition) warned Bashaw about speaking out against Mr. Beatrice. (*See* Deposition of Keyon Beckley, Exh. Q to D's MSJ, RE 21-17, at 16: "Q: Okay. Do you recall ever informing Ms. Bashaw that she should be careful about speaking out against Edward [Beatrice]? A: I did. I did mention that to her.") There is no doubt that after hearing Bashaw's complaints lodged against him, Mr. Beatrice decided to recommend her termination.  Bashaw can establish the requisite causal connection.

### 2.     Pretext Analysis

Once Bashaw establishes a prima facie claim of retaliation, the burden shifts to Majestic Care to offer a legitimate reason for her termination. *Dolan*, 2003-Ohio-3383, ¶ 20. If Majestic Care proffers a legitimate reason, the burden shifts to Bashaw to present some evidence that the proffered reason was pretextual. *Id*.

As the District Court noted, Majestic Care offered four reasons in support of its decision to terminate of Bashaw's employment: "(1) Ms. Bashaw told Ms. Nieset that she did not want to return to work; (2) Ms. Bashaw had surreptitiously recorded work conversations and meetings; (3) Ms. Bashaw violated company policies regarding the safe discharge of a resident; and (4) Ms. Bashaw was often tardy or missed work." (MSJ Decision, RE 35, PageID #1061) The District Court analyzed each in turn, and it concluded that all but one of the reasons were not pretextual. (Id. PageID #1063) The District Court concluded that only Majestic Care's third reason (violation of the safe resident discharge policy) raised a genuine issue of material fact as to pretext.

When a defendant proffers multiple reasons for termination, the proper analysis is whether the "plaintiff manages to cast substantial doubt on a fair number of them." *Nathan v. Ohio State Univ.*, 984 F. Supp. 2d 789, 801 (S.D. Ohio 2013). "The issue is qualitative, not quantitative: the court must determine whether the plaintiff has presented sufficient evidence from which a factfinder could conclude

that the defendant's explanation is false, and that discrimination was the real reason." *Id*. (internal citations omitted).

The Sixth Circuit has cautioned that "an employer's strategy of simply tossing out a number of reasons to support its employment action in the hope that one of them will 'stick' could easily backfire." *Smith v. Chrysler Corp*., 155 F.3d 799, 809 (6th Cir.1998). Circuit courts across the country have echoed this, specifically noting that plaintiffs need not discredit every reason advanced by a defendant. For example, the Tenth Circuit has held that discrediting one dominant reason for discharge can cast doubt on all remaining reasons, even if they have not been discredited. *Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114, 1127 (10th Cir. 2005). Likewise, the Third Circuit has explained that a plaintiff need not cast doubt on each termination reason in a vacuum: "If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder. That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available." *Fuentes v. Perskie*, 32 F.3d 759, 764-65 n.7 (3d Cir. 1994). See also *Smith v. Good Samaritan Hosp*., No. 1:06-cv-207, 2007 U.S. Dist. LEXIS 48304, 2007 WL 1974952, (S.D. Ohio July 3, 2007) (holding that demonstrating one

of the defendant's two stated reasons for termination is a pretext is enough to meet plaintiff's burden).

Majestic Care has compiled every possible reason it could come up with to terminate Bashaw after she made her protected complaints. As set forth below, when viewing the totality of circumstances, evaluating *quality or quantity*, this Court should find that Bashaw has produced sufficient evidence from which a jury can reasonably reject Majestic Care's explanations. See *Nathan*, 984 F. Supp. 2d at 798. At the summary judgment stage, a plaintiff need only rebut, not disprove, the employer's preferred rationale. *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir.2012).

    a.    <u>Reason 1: Bashaw did not want to return to work.</u>

The first reason for termination analyzed by the District Court's was Ms. Nieset's belief that Bashaw did not want to return to work. (MSJ Decision, RE 35, PageID #1063) In her summary judgment briefing, Bashaw attacked this reasoning as pretextual because it was not based in fact. In other words, Bashaw did want to return to work and never indicated a desire otherwise. (Plaintiff's Resp. in Opp. to MSJ, RE 30, PageID #862)

During her deposition, Ms. Nieset testified that Bashaw stated she did not "feel comfortable" returning to the facility after Bashaw was placed on leave while Majestic Care investigated. (Nieset Dep. at PageID #805) Yet, a review of the transcript of this recorded conversation proves that Bashaw never indicated this

preference to Ms. Nieset. Instead, during the phone call, Ms. Nieset asked Bashaw to explain, if she felt she needed to record meetings, why she would "even want to continue to work in an environment like that." (Recording #3 Transcript, p.8) Bashaw responded that she did not "want a working environment [like] that." (*Id.* at p.9) Bashaw explained that she had a "lot of hope that things would get better" and that the "communication would change." (Id.) She went on to say that she cares about the residents so deeply and that she loves her job and taking care of the residents. (Id.) These statements cannot reasonably be interpreted to mean that she did not wish to return to work and was "unwilling[] to work at Majestic Care entirely" as the District Court improperly concluded. (MSJ Decision, RE 35, PageID #1066)

The District Court expressly acknowledged that "with the benefit of a transcript, Ms. Bashaw **did not say what Ms. Nieset understood her to say."** (MSJ Decision, RE 35, PageID #1064) (emphasis added) Nonetheless, the District Court applied the honest belief rule, concluding that Ms. Nieset honestly believed that Bashaw did not want to return to work. (*Id.* at PageID #1065-66)

This is an improper application of the honest belief rule. "In order to determine whether the defendant had an 'honest belief' in the proffered basis for the adverse employment action, [the Sixth Circuit Court] looks to whether the employer can establish its 'reasonable reliance' on the particularized facts that were before it at the time the decision was made." *Braithwaite v. Timken Co.,* 258 F.3d 488, 494 (6th Cir.

2001) (citing *Smith v. Chrysler*, 155 F.3d 799, 807 (6th Cir. 1998)). In determining whether an employer reasonably relied on particularized facts, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action. *Id.* (citing *Smith* at 807).

Ms. Nieset was a party to this conversation. During her deposition, she claimed Bashaw told her something that the transcript demonstrates Bashaw did not say, i.e., that she did not want to return to work. Thus, Ms. Nieset could not have had an honest belief that Bashaw said something she did not say when Ms. Nieset herself was engaged directly in this conversation with Bashaw. Bashaw need not provide any other evidence that  Ms. Nieset did not "honestly believe" she did not want to return to work. The recorded conversation *is* the evidence demonstrating that Bashaw never said what Ms. Nieset claims she did.

The District Court also concluded that Ms. Nieset *may* have had other reasons for believing Bashaw did not wish to return to work, citing information in Mr. Kuhn's notes. (MSJ Decision, RE 35, PageID #1065) Yet, Ms. Nieset did not rely on this additional information in her deposition in support of this reason for termination. Instead, she relied solely on the phone conversation she had with Bashaw during which Bashaw allegedly informed her she did not "feel comfortable going [into the facility] right now." (Nieset Dep. PageID #805) With the benefit of the transcript of the recorded call, Bashaw can prove that this reason for her termination is pretextual because it is not based in fact.

29

b.    Reason 2: Bashaw recorded work conversations and meetings

The District Court next analyzed Majestic Care's second reason for terminating Bashaw: that she recorded meetings without Majestic Care's staff's knowledge or consent. (Nieset Dep. PageID #805-806)

During Ms. Nieset's HR investigation, she spoke with Bashaw by phone on March 4, 2022. During the call, Bashaw stated that she recorded two manager meetings. (Recording #3 Transcript, p.10) Bashaw explained that she believed recording the meetings was necessary to protect her license, as she felt her license was at risk due to the unethical and illegal things happening at Majestic Care. (Recording #3 Transcript, p.8; Bashaw Dep. PageID #644) Majestic Care contends that these actions are grounds for termination. (Defendant's MSJ, RE 21, PageID # 239–40) Bashaw can provide sufficient evidence from which a jury can conclude that this reason is also pretextual, as it did not actually motivate Majestic Care's decision to terminate her.

Citing *Stein v. National City Bank*, 942 F.2d 1062, 1065 (6th Cir. 1991), the District Court emphasized that "[w]hether a policy is written or unwritten has minimal probative value on the issue of pretext." (Decision on MSJ, RE 35, PageID# 1066) However, the *Stein* Court went on to explain that an unwritten policy may "tend to prove that a defendant attaches little weight to the policy" and notes the importance of whether that policy was "reliably communicated" to employees and consistently enforced. *Id.*

The District Court also relied on two cases that are inapposite to Bashaw's situation. First the Court cited *Quintanilla v. AK Tube LLC*, 477 F.Supp.2d 828 (N.D. Ohio 2007) for the proposition that simply becuase a policy is unwritten does not mean it is an improper standard to which to hold employees. (Decision on MSJ, RE 35, PageID# 1067) Yet, in conducting its pretext analysis, the *Quintanilla* court emphasized that the employee was terminated for violating a <u>known</u> policy. *Id*. at 834. Although the policy was not reduced to writing, the plaintiff in that case admitted he was aware of the policy prohibiting him from taking scrap material from the employer's facility, and that fellow employees were aware of the policy and "generally followed a pattern of abiding by it." *Id*. at 830. Further, the plaintiff admitted to violating this known rule. *Id*. at 834.

Next, the court cited *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387 (6th Cir. 2008) for further support that an unwritten policy can serve as a legitimate reason for termination. In *Allen*, the plaintiff, an employee at a hospital, was aware that her actions would violate HIPAA; despite this, she continued her efforts to retrieve a patient's medical records without a proper authorization, forged a patient's signature, and released the patient's medical records. *Id.* at 391-92. The Court rejected the plaintiff's argument that because the hospital did not have a written policy governing the release of records, the hospital's decision to terminate her based upon its belief that she violated HIPAA and her employer's privacy policy was pretextual. *Id*. at 399.

31

In Bashaw's case, no policy—written or unwritten—exists. During her deposition, Nieset admitted that Majestic Care does not have any policy prohibiting a manager from recording during manager meetings. (Nieset Dep. PageID #807)  A policy that does not exist cannot be "reliably communicated" to employees. Further, there is no evidence that: 1) Bashaw was aware of any prohibition against recording, 2) she utilized these two recorded meetings for any improper purpose, or 3) she released or shared the recordings to anyone aside from her counsel to be used in this litigation. Majestic Care does not allege Bashaw misused or disclosed the recordings. Under these circumstances, the recording is no different than Bashaw taking notes during a managers' meeting during which patient information was discussed and reduced to writing in her notes.

Bashaw testified that she recorded two manager meetings only for the sake of protecting her license. (Bashaw Dep. PageID #644) Bashaw informed Ms. Nieset during the call on March 4th that the recordings were done for her "professional safety." (Recording #3 Transcript, p.10) Notably, Ms. Nieset did not inform Bashaw during the March 4th phone call that she violated Majestic Care policy against recording meetings. And she assured Bashaw during the phone call that she was not saying she was going to fire her for the recordings. (Recording #3 Transcript, p.10: "No way did I ever say that.") This is evidence from which a jury could conclude that the recorded meetings were not the real motivation for Bashaw's termination;

instead, it was one of the many reasons compiled by Majestic Care "in the hope that one of them will stick." *See Smith*, 155 F.3d at 809.

      c.    <u>Reason 3: Violation of Safe Resident Discharge Policy related to Resident B</u>

The District Court properly concluded that Majestic Care's third reason for terminating Bashaw raises a genuine issue of material fact as to pretext. For the same reasons, this Court can come to the same conclusion.

In its motion for summary judgment, Majestic Care argued that Bashaw refused the re-admission of Resident B, which violated Majestic Care's policy on safe resident discharge, and also causes "a potential violation" of federal and state law. (Defendant's MSJ, RE 21, PageID #239)

As an initial matter, during her deposition, Ms. Nieset was presented with Majestic Care's resident discharge policy. (Nieset Dep. PageID #644; Exhibit I to Plaintiff's Resp. in Opp. to MSJ, RE 30-9, PageID #1011-1014) Ms. Nieset confirmed it was the policy she believed Bashaw violated; however, she was unable to identify how the policy was violated. (Nieset Dep. PageID #807): "Q: Okay, Can you point me to the portion of this policy you believe Ms. Bashaw violated? A: I cannot."

Instead, Ms. Nieset relied blindly on inaccurate information provided by the retaliating supervisor, Mr. Beatrice, to conclude that Bashaw engaged in behavior that warranted her termination. (Nieset Dep. PageID #638-639, 643) Accordingly,

the District Court properly analyzed Majestic Care's reasoning under a cat's paw theory.

In the employment context, "cat's paw refers to a situation where an individual who lacks decision-making power uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Marshall v. Rawlings Co. LLC*, 854 F.3d 368, 377 (6th Cir. 2017) (internal citations omitted). Under the cat's paw theory of liability, the plaintiff seeks to "hold [her] employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Id*. (citing *Staub v. Proctor Hosp*., 562 U.S. 411, 415 (2011)).

To succeed on a cat's paw theory of liability, the plaintiff "must offer evidence of a 'causal nexus' between the ultimate decisionmaker's decision to terminate her and the supervisor's discriminatory animus." *Bishop v. Ohio Dep't of Rehab. & Corr*., 529 Fed. Appx. 685, 696 (6th Cir. 2013). The employer can defeat this causal nexus only by establishing the ultimate decision was "based on an independent investigation and the employee presented no evidence that the supervisor's discriminatory animus had influenced the decision." *Id*. (emphasis added)

Bashaw did not, and could not, make the decision not to re-admit Resident B at Majestic Care. (Bashaw Dep. PageID #644) Bashaw relayed this information to Ms. Nieset during the investigation phone call on March 4, 2022. (Recording #3 Transcript, p.4-5) Bashaw explained that Mr. Beatrice accused her of informing Mt.

34

Carmel employee, Kathy, that Majestic Care would not readmit Resident B. (Recording #3 Transcript, p.4-5) Bashaw informed Ms. Nieset that she never spoke with Kathy. Instead, she talked with Jennifer, and at no time did she state that Majestic Care would not accept Resident B. (Recording #3 Transcript, p. 4-5) Bashaw also provided Ms. Nieset of the names of two witnesses who were in the room with her when she spoke with Mt. Carmel's social worker. (Nieset Dep. PageID #802) Yet, Ms. Nieset failed to interview either witness. (Id.) Ms. Nieset also failed to speak with either social worker at Mt. Carmel. (Id.) Ms. Nieset admitted that all information she had with respect to the Resident B issue came from Mr. Beatrice. (Nieset Dep. PageID #802)

With respect to this reason for termination, Bashaw can demonstrate that decision-maker, Ms. Nieset, failed to conduct an independent investigation and relied solely on information that she was provided from the retaliating supervisor, Mr. Beatrice. As the District Court held, "[t]his is hardly the 'in-depth and truly independent investigation' that is required to avoid pretext—to the contrary, it seems as though Ms. Nieset relied almost entirely on 'facts provided by' Mr. Beatrice rather than conducting 'an independent evaluation of the situation.'" (Decision on MSJ, RE 35, PageID# 1069) (citations omitted).

     d.   <u>Reason 4: Attendance</u>

Majestic Care's final reason in support of Bashaw's termination is her attendance issues. (Nieset Dep. PageID #805) Specifically, Majestic Care alleges

that Bashaw was absent eight times and tardy 11 times during the course of her employment. (Defendant's MSJ, RE 21, PageID # 1044, citing Corrective Action Form, RE 21-3, PageID #249) Because of these attendance infractions, Majestic Care argues that it had a legitimate reason to terminate Bashaw.

As an initial matter, Bashaw disputes that Majestic Care's record of her attendance was accurate. (See Recording #3 Transcript, p. 10-11: "Q: [A]re you denying any of the attendance issues[?]: A: Yes.") However, even assuming Bashaw actually did incur the unexcused absences and tardies Majestic claims she did, Bashaw can provide sufficient evidence to demonstrate that these attendance issues did not actually motivate the decision to terminate her.

First, Mr. Beatrice testified that he prepared a corrective action that he intended to present to Bashaw on March 1, 2022. (Beatrice Dep. PageID #555)  At that time, Mr. Beatrice believed issuance of a "First corrective action related to absenteeism and tardiness" was warranted. (Beatrice Dep. PageID #554; See also Corrective Action Form, RE 21-3, PageID #249) The Corrective Action form utilized by Majestic Care provides for progressive disciplinary steps, including options to select: 1st Corrective Action; 2nd Corrective Action; 3rd/Final Corrective Action; and Discharge. (Corrective Action Form, RE 21-3, PageID #249) As Mr. Beatrice indicated on the first corrective action form that he prepared for Bashaw, "[a]dditional occurrences could result in second corrective actions." (Corrective Action Form, RE 21-3, PageID #249) Ultimately, Mr. Beatrice was unable to deliver

the first corrective action form to Bashaw on March 1, 2022 because he believed she left the facility early that day. (Beatrice Dep. PageID #555) As of March 1, 2022, Mr. Beatrice did not think that Bashaw's attendance issues warranted termination, as evidenced by his decision to present her with a *first* corrective action. It was not until after: 1) Mr. Beatrice learned that Bashaw had lodged a complaint of sexual harassment and racial insensitivity against him to Chandler Kuhn on March 1st; and 2) Bashaw complained about Majestic Care's decision to lock Resident B in the memory care unit without a proper diagnosis on March 2nd, that Majestic Care apparently deemed Bashaw's attendance issues worthy of discharge.

Further evidence in support of this can be found by evaluating Majestic Care's failure to uniformly apply the tardiness policy. During his deposition, Mr. Beatrice testified that department managers are considered "late" any time they arrived after the start of the 9:00 a.m. morning meeting. (Beatrice Dep. PageID #550) He testified that a manager was "tardy" if he or she arrived after 9:15 a.m. (Id.) However, later in his deposition, Mr. Beatrice admitted that he considered a department manager to be "tardy" at 9:01 a.m. (Beatrice Dep. PageID #556) Ms. Nieset confirmed this same understanding during her March 4, 2022 phone call with Bashaw: " "Every time you do not [arrive] by 9:00 for morning meeting, it's a tardy. And that's been made very clear to everybody." (Recording #3 Transcript, p.10)

Given this inconsistency, it is far from clear whether a department manager is considered "late" or "tardy" if he or she arrives for morning meeting after 9:00 a.m.,

but before 9:15 a.m. Mr. Beatrice admitted that of the 11 tardies he recorded for Bashaw, he could not say what time she actually arrived at the facility on any of those days. (Beatrice Dep. PageID #552-553)

Even assuming Bashaw often arrived at morning meeting sometime after 9:00 a.m., this was not unique to her. Mr. Beatrice testified that tardiness was a problem with multiple department managers, and that this was a topic of discussion during a January 2022 manager meeting. (Beatrice Dep. PageID #554) Additionally, Bashaw submitted the declaration of a fellow department manager, Jailah Hopson, who reported to Mr. Beatrice. (Hopson Dec., RE 30-3, ₱4) Hopson testified that: 1) she was often late to morning meeting; 2) other managers were often late to morning meeting; and 3) it was very common for at least one other manager to be late to the morning meeting every day. (Id. at ₱6-7) Ms. Hopson testified that she was absent 4-5 times during her employment without prior advanced notice. (Id. ₱9) Ms. Hopson never received any discipline or corrective action related to her absences or her tardiness. (Id. ₱8, 10)

Considering this evidence, the District Court held that Bashaw was not similarly situated to Ms. Hopson. (MSJ Decision, RE 35, PageID #1071) In reaching this finding, the District Court applied an extremely narrow standard, requiring Bashaw to provide evidence of nearly identical attendance infractions to be comparable. As the Sixth Circuit has emphasized, a plaintiff is "not required to demonstrate an exact correlation with the employee receiving more favorable

treatment in order for the two to be considered similarly situated." *Drerup v. Netjets Aviation Inc*., 6th Cir. No. 22-3475, 2023 U.S. App. LEXIS 16469, at *22 (June 27, 2023) (finding the district court erred in applying an "overly narrow and unmoored" definition of "similarly situated" when rejecting plaintiff's comparators as similarly situated when they did not have identical infractions and failures as those the plaintiff committed)  (internal citations omitted). Instead, a plaintiff need only show she is similar to the comparator in all relevant aspects. *Id*.

As set forth above, Bashaw has provided evidence that other department managers, including Ms. Hopson, were often late to morning meetings and that it was common for at least one manager to be late *every day*. (Hopson Dec., RE 30-3, ¶6-7) Mr. Beatrice acknowledged this, admitting he had concerns with multiple managers' absenteeism and tardiness; yet he never issued corrective action to the other managers for these infractions. (Beatrice Dep. at PageID #553-554) Bashaw was the only one to whom Mr. Beatrice decided to draft a corrective action.  Then, after learning of Bashaw's protected complaints as set forth above, Mr. Beatrice abandoned his plan to present Bashaw with a corrective action and instead recommended Bashaw's termination. (Beatrice Dep. PageID #568)

Viewing this evidence in total, a jury could certainly determine that Bashaw's alleged attendance issues did not actually motivate its decision to terminate her.

## VII.  **CONCLUSION**

For the reasons set forth herein, Bashaw respectfully requests this Court REVERSE the District Court's Order granting Majestic Care's Motion for Summary Judgment, and REMAND this case to be tried to a jury on Bashaw's three retaliation claims.

Respectfully submitted,

*/s/ Carrie J. Dyer*
Carrie J. Dyer (0090539)
(*Carrie@Manselllawllc.com*)
Greg R. Mansell (0085197)
(*Greg@Manselllawllc.com*)
Rhiannon M. Herbert (0098737)
(*Rhiannon@Manselllawllc.com*)
**Mansell Law LLC**
1457 S. High St.
Columbus, Ohio 43207
Telephone: (614) 796-4325

*Attorneys for Plaintiff-Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the enclosed brief complies with the type-volume limitation under Federal Rule of Appellate Procedure 32(a)(7). The brief contains no more than 13,000 words. The Brief has been prepared in proportionally spaced typeface using Microsoft Word  in Times New Roman 14-point font.

/s/ Carrie J. Dyer
Carrie J. Dyer (0090539)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 11, 2024, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's ECF system.

/s/ Carrie J. Dyer
Carrie J. Dyer (0090539)

## DESIGNATION OF RELEVANT LOWER COURT DOCUMENTS

| Description of Document | Record Entry Number | Page Range ID# |
|---|---|---|
| Complaint | 2 | 80-89 |
| Amended Complaint | 7 | 129-140 |
| Defendant's Notice of Removal to USDC, SDOH | 1 | 1-5 |
| District Court's Opinion & Order on Defendant's Motion to Dismiss Count II of the Amended Complaint | 17 | 198-204 |
| Defendant's Motion for Summary Judgment | 21 | 221-242 |
| Kirstyn Paige Bashaw Deposition Transcript, Volume I, SEALED Exhibit B to Defendant's Motion for Summary Judgment | 25-1 & 25-2 | 469-498 |
| Kirstyn Paige Bashaw Deposition Transcript, Volume II, REDACTED Exhibit B to Defendant's Motion for Summary Judgment | 27-4 | 690-734 |
| Corrective Action Form, Exhibit C to Defendant's Motion for Summary Judgment | 21-3 | 248-249 |
| Edward Beatrice Deposition Transcript, SEALED & REDACTED Exhibit D to Defendant's Motion for Summary Judgment | 25-4 (Sealed)<br><br>28-1 (Redacted Excerpts) | 535-587<br><br>821-832 |

| | | |
|---|---|---|
| Melany Nieset Deposition Transcript, SEALED Exhibit F to Defendant's Motion for Summary Judgment | 25-5 | 587-618 |
| Chandler Kuhn File Note, Exhibit G to Defendant's Motion for Summary Judgment | 21-7 | 256-257 |
| Cover Letter filed by Defendant with Manually-Filed **Exhibits L, M, & P** (Audio Recordings & Transcripts) | 26 | 619 |
| Recording # 2: Exhibit L to Defendant's MSJ | 21-12 | 266 |
| Recording # 3: Exhibit M to Defendant's MSJ | 21-13 | 267 |
| Recording # 1: Exhibit P to Defendant's MSJ | 21-16 | 298 |
| Keyon Beckley Deposition Transcript, Exhibit Q to Defendant's Motion for Summary Judgment | 21-17 | 299-310 |
| Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment | 30 | 837-870 |
| Bashaw Declaration, Exhibit A to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment | 30-1 | 871-873 |
| Jailah Hopson Declaration, Exhibit C to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment | 30-3 | 884-887 |

| | | |
|---|---|---|
| Resident Discharge Policy, Exhibit I to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment | 30-9 | 1011-1014 |
| Defendant's Reply in Support of its Motion for Summary Judgment | 34 | 1040-1050 |
| District Court's Opinion & Order Granting Summary Judgment | 35 | 1051-1072 |
| District Clerk of Court's Judgment Entry | 36 | 1073 |
| Plaintiff's Notice of Appeal | 37 | 1074-1075 |